IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 16-cv-01245-MSK-CBS

TAMARA A. KERNS, and
DOROTHY J. CZAJKOWSKI, as co-guardians for John M. Czajkowski and Dorothy J. Czajkowski,

    Plaintiffs,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,

    Defendant.
_____

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND DISMISSING WRIT OF GARNISHMENT**
_____

**THIS MATTER** comes before the Court pursuant to the Defendant's ("National") Motion for Summary Judgment **(# 29)**, the Plaintiffs' ("the Czajkowskis") response **(# 32)**, and National's reply **(# 35)**.

## JURISDICTION

This action is for recovery of insurance benefits following an automobile accident. The Court exercises jurisdiction pursuant to 28 U.S.C. 1332.

## FACTS

The Court briefly reviews the salient facts here and elaborates as necessary in its analysis.

On October 20, 2013, John and Dorothy Czajkowski's vehicle was rear-ended by a 2006 Jeep Liberty driven by 17-year old, intoxicated Thomas Huntley. The accident caused both of the Czajkowskis to suffer severe and permanent physical injuries. The Czajkowskis commenced suit against Mr. Huntley in state court, and ultimately obtained a jury verdict in their favor of

approximately $4.84 million. It is unclear whether and to what extent Mr. Huntley was insured, but it is fair to assume that his coverage encompassed only a fraction of the judgment against him.

The Czajkowskis then turned to a new party, the Larry H. Miller Group ("Miller"), in an attempt to recover on the judgment. Miller, an auto dealer, purchased the 2006 Jeep Liberty from a private seller on or about October 12, 2013, approximately a week before the accident. Although the particulars of the subsequent transaction are somewhat disputed, it appears that on October 15, 2013, Miller sold the Jeep to David Huntley, Thomas Huntley's father. Contending that the sale to David Huntley was never fully completed, the Czajkowskis contend that Miller remained the legal owner of the vehicle at the time of the accident. Thus, they sought payment of the judgment from Miller's insurers. Zurich, Miller's primary insurer, tendered its full policy limits of $50,000. The Czajkowskis then turned to Defendant National, Miller's excess insurer. Proceeding by Writ of Garnishment **(# 1-3)**, the Czajkowskis sought to execute the judgment against Miller's excess policy with National. National answered the writ by denying that the Miller policy constitutes property belonging to Mr. Huntley.

National now moves for summary judgment, seeking a finding that the policy issued to Miller does not insure losses caused by Mr. Huntley or the accident at issue. National raises three primary arguments in support of its motion: (i) its policy insures only those drivers who operate the vehicle with Miller's permission, and Miller's sale of the vehicle to David Huntley terminated Miller's ability to grant permission to anyone to use the vehicle; (ii) the judgment amount does not satisfy the $5 million threshold for triggering National's coverage; and (iii) even if the accident was otherwise covered by National's policy, Mr. Huntley's criminal conduct in driving while intoxicated triggers a policy exclusion that negates any coverage.

## ANALYSIS

### A. Standard of review

This case is in a slightly unorthodox procedural posture, as the Czajkowskis are proceeding by Writ of Garnishment against National, rather than through the more traditional process of filing a Complaint asserting claims. Enforcement of a money judgment is governed by the procedure of the state where the enforcing court is located. Fed. R. Civ. P. 69 (a)(1). Because this action is brought in the District of Colorado, Colorado law applies. According to Colorado law, summary judgment is an appropriate means for determining whether there is a colorable basis for the garnishor to reach assets in the possession of the garnishee. *See e.g. Mountain States Mut. Cas. Co. v. Roinestad,* 296 P.3d 1020, 1023 (Colo. 2013).

Treating this action as an independent action, the Court applies the Federal Rules of Civil Procedure in its resolution. Rule 56 facilitates the entry of a final determination there is not genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P 56(a); *White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Substantive law governs which facts are material and what issues must be determined. As noted below, there are no material facts in dispute and the parties present only an issue of law.

### B. Permissive operation

It is undisputed that Mr. Huntley is not among the insureds found within the express terms of National's policy. However, National's policy also extends coverage to "any person . . . included as an additional insured under Scheduled Underlying Insurance" – that is, any person who would be considered insured under Miller's policy with Zurich. The Zurich policy, in turn, provides coverage for "any other person . . . using an auto covered by this coverage part within the scope of you [*i.e.* Miller's] permission."

Although the key question is whether <u>Thomas</u> Huntley was driving the Jeep with Miller's permission, the parties' argument focuses on a different question: the date upon which Miller surrendered the ability to exercise control over who could operate the Jeep. Even that question is somewhat secondary in the briefing, as the parties instead focus their efforts on the question of when the sale of the Jeep from Miller to <u>David</u> Huntley became legally effective (a date the parties appear to use as a proxy for when Miller's control over the operation of the Jeep ceased). National contends that the sale was effective upon the transfer of physical possession of the Jeep to David Huntley, a date that occurred some five days prior to the accident. The Czajkowskis contend that the sale was not effective until the formal transfer of title paperwork from Miller to David Huntley, an event that did not occur before the accident (and indeed, apparently never occurred thereafter).[1]

The material facts on this point are undisputed. Miller acquired the Jeep from a seller on October 12, but the seller did not provide title to the Jeep to Miller on that date. Title was not transferred from that seller to Miller until November 7 (after the accident had already occurred). Miller sold the car to David Huntley on October 15, according to a written "Wholesale Purchase Agreement" that identified the vehicle and set a sale price. No money immediately changed hands, owing to Miller and David Huntley's prior business relationship. Miller provided the

---

[1] There is an inherent logical flaw in the Czajkowski's argument. They appear to argue that the transfer of title is the *sine qua non* of a transfer of ownership, such that Miller's failure to convey the Jeep's title to David Huntley left Miller as the legal owner of the Jeep. By that same logic, the original seller of the Jeep's failure to promptly convey the title to Miller prevented <u>Miller</u> from having any ownership interest in the Jeep either, and ownership at the time of the accident remained in the hands of the original seller.

The Czajkowskis elide this difficulty by contending that "the Certificate of Title Act does not prevent ownership from passing from one seller to one purchaser [but] it does prevent the purchaser from reselling the vehicle before it receives valid title." Neither C.R.S. § 42-6-109(1) nor *Guy Martin Buick, Inc. v. Colorado Springs Nat'l. Bank*, 519 P.2d 354 (Colo. 1974), the authorities the Czajkowskis cite in support of that argument, make such a fine distinction.

keys to the Jeep to David Huntley, and David Huntley drove the vehicle off of Miller's premises, storing it at his own home. The Wholesale Purchase Agreement acknowledged that Miller would retain a security interest in the vehicle until full payment was made.

National's argument derives from Colorado's version of the Uniform Commercial Code, C.R.S. § 4-2-401(2). That statute provides "unless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes . . . physical delivery of the goods, . . . even though a document of title is to be delivered at a different time or place." The Czajkowskis rely on the Colorado Certificate of Title Act, which requires that "a person shall not sell or otherwise transfer a [vehicle] to a purchaser . . . without delivering . . . a certificate of title to the vehicle." C.R.S. § 4-2-108(1). That same provision goes on to provide that "a purchaser or transferor does not acquire any right, title, or interest in and to a motor [ ] vehicle . . . unless and until he or she obtains from the transferor the certificate of title duly transferred." C.R.S. § 42-6-109(1).

Although the Czajkowski's argument has the superficial benefit of seeming to be binding statutory authority, the courts of Colorado have not applied those statutes in the way that Czajkowskis urge. Facing an effectively identical set of facts to the instant dispute, the Colorado Court of Appeals in *Hall v. Hong Seung Gee*, 725 P.2d 1164, 1165 (Colo. App. 1986), explained that although the Certificate of Title Act "appear[s] to provide an unambiguous statement as to when ownership of a car passes from seller to buyer[,] Colorado appellate court decisions interpreting or applying these statutes differ and are not reconcilable." In *Hall*, an individual named Shin had purchased a vehicle from Gee. Although Shin delivered the purchase price and Gee had delivered the keys, the parties had agreed that Gee would not have to turn over the Certificate of Title until several days later. In the interim, Shin was involved in an accident with

the vehicle that injured the plaintiffs. Unable to recover for the full extent of their injuries from Shin, the plaintiffs sued Gee. They claimed that, because title had not yet transferred as required by the Certificate of Title Act, Gee was still the owner of the vehicle at the time of the accident. The plaintiffs argued that Shin's use of the vehicle rendered him an insured under Gee's insurance policy, which covered "any person who used a car owned by him if driven with his permission." The Colorado Court of Appeals noted the plaintiffs' argument premised on the Certificate of Title Act, acknowledged the disparity of interpretations that Colorado courts had given the Act, discussed several cases that illustrated that disparity, and interpreted that the binding rule of law in Colorado is: "non-delivery of the certificate of title does not prevent a change of ownership, and [ ] delivery of possession constitutes a transfer of ownership as between the parties involved." *Id.* at 1166. Thus, the court held that "[Gee] was not the owner of the car at the time of the accident [and Shin] was not a person who used the car with permission for insurance purposes." *Id.*

Obviously, *Hall* is squarely on-point in this case in all material respects but one, and thus effectively compels judgment in favor of National. The sole distinguishing fact between the two cases is that, here, David Huntley did not tender the purchase price to Miller at the time Miller turned over the keys to the Jeep (whereas Shin had tendered full payment to Gee). Thus, the sole question is whether Miller's retention of a security interest (per the Wholesale Agreement) in the Jeep is sufficiently distinguishable from the circumstances in *Hall* to compel a different outcome.

The security interest retained by Miller is shown on the Wholesale Purchase Agreement form. It provides that "[David Huntley] grants [Miller] a security interest in the Vehicle being purchased to secure full payment under the Uniform Commercial Code." Thus, Miller's retained interest was solely the right to retake possession of the Jeep if David Huntley were to

default on the parties' agreement regarding payment of the purchase price.[2] C.R.S. § 4-6-609(1). Miller did not purport to retain any other rights to control David Huntley's use of the vehicle. In this sense, the security interest is simply that: an *interest* in a piece of physical property that can be exercised only after a breach of the terms of payment. As between Miller and David Huntley, at the time of delivery, Miller relinquished all other rights in the vehicle – including the right to determine who could drive it. The situation is akin to a bank who holds a security interest in a vehicle it finances for a borrower: the bank retains the ability to retake the vehicle upon non-payment, but does not purport to dictate to the lender who the lender may allow to drive it. Thus, the presence of Miller's inchoate security interest in the Jeep in no way alters the application of *Hall* to the facts here.

The Court need not exhaustively address each of the cases that the Czajkowskis cite in support of their argument. Many of those cases predate *Hall*. Others, like *Sachtjen v. American Family Mut. Ins. Co.*, 49 P3d. 1146, 1149 (Colo. 2002), actually support National's position in this mater. In *Sachtjen*, the owner of a vehicle entered into a agreement with his roommate to sell the vehicle to her, with payment to be made over an extended period of time. During the payment period, the owner allowed the roommate to use the vehicle, but he retained title to the vehicle, continued to pay for the insurance on it, kept a spare set of keys to the vehicle, and placed certain conditions upon the roommate's use of it ("he specified that [she] not put excessive mileage on the vehicle nor allow anyone else to drive it"). Before the payment period was complete, the roommate was involved in an accident and the victims of that accident turned to the owner's insurer for payment for their injuries. The Colorado Court of Appeals held that

---

[2] Beyond identifying the agreed-upon purchase price, the record does not reflect what terms Miller and David Huntley reached on when and how David Huntley would make payment of the agreed-upon price. Neither party has contended that David Huntley was in default on whatever those terms might have been as of the date of the accident.

ownership of the car had transferred to the roommate before the accident occurred, but the Colorado Supreme Court disagreed. It explained that, in circumstances where the agreement to sell a vehicle contains terms that remain executory, "[w]hether or not the right of immediate possession vests in a conditional vendee ultimately depends upon the agreement of the parties." In the facts presented in that case, there were substantial indicia – the owner's retention of keys, the owner dictating the terms on which the roommate could use the car, the owner's continued payment of insurance – that suggested that the parties' agreement continued to repose ownership of the vehicle in the owner, not the roommate, and thus, the Colorado Supreme Court reversed the grant of judgment to the insurer and remanded the case for further inquiry into the true ownership of the vehicle at the time of the accident.

None of the factors present in *Sachtjen* are present here. There is no indication that Miller agreed, as part of the sale to David Huntley, that Miller would continue to insure the vehicle. There is no indication that Miller retained a spare set of keys, or that Miller placed (or even believed that it could place) restrictions on how David Huntley operated the vehicle. The absence of any such facts here suggest that the correct outcome is precisely the opposite of *Sachtjen. B*y all appearances, Miller unconditionally transferred possession and control of the Jeep to David Huntley.

Accordingly, the Court finds that National has no legal obligation to Miller to pay on a judgment rendered against Thomas Huntley. Because Miller possessed no right to control the use of the Jeep as of the time of the accident, it has no ability to authorize Thomas Huntley to drive it. Thus, Mr. Huntley's use did not render him an insured under the Zurich policy issued to Miller, nor, by extension, did it render him an insured under National's policy.

**C. Criminal acts exclusion**

Although the preceding discussion is sufficient, of itself, to grant summary judgment to National, the Court briefly addresses one of the parties' remaining arguments for purposes of completeness.[3]

Assuming the National policy included Mr. Huntley as an insured, National argues that the policy nevertheless excludes coverage for the accident because Mr. Huntley's impaired driving falls within the policy's exclusion for injuries caused by criminal acts. On this point, National's policy incorporates by reference the exclusions contained in the Zurich policy. The Zurich policy provides that "this insurance does not apply to . . . [a] claim arising out of any dishonest, fraudulent, or criminal acts committed by an insured." I

It is undisputed that Mr. Hutley was intoxicated at the time of the accident and that he subsequently pled guilty to criminal charges of vehicular assault and driving under the influence. National thus argues that, by operation of the Criminal Acts exclusion in the Zurich policy, its own policy affords no coverage for the accident.

The Court operates from the assumption that the Czajkowskis admit that Mr. Huntley's conduct, on its face, falls within the terms of the Criminal Acts exclusion in the Zurich policy. It seems undisputed that the accident, and thus the Czajkowski's claim, arose as a direct result of Mr. Huntley engaging in the criminal acts of driving while intoxicated and engaging in vehicular assault, the latter of which is a felony. C.R.S. § 18-3-205(1)(b), (c).

In response, the Czajkowskis argue that courts <u>outside of Colorado</u> have "declined to apply criminal acts exclusions in the context of automobile liability insurance policies." *Citing, inter alia*, *Weekes v. Atlantic Nat. Ins. Co.*, 370 F.2d 264, 274 (9th Cir. 1966) *and Allstate Indem.*

---

[3] The Court expresses no opinion on the parties' third dispute: whether National's policy limits are triggered by the amount of the Czajkowski's judgment.

*Co. v. Wise*, 818 So.2d 524, 527 (Fla.App. 2001).  The crux of these cases is that many states promulgate "financial responsibility laws" that are "designed to protect the public from losses resulting from ownership and operation of motor vehicles, up to specified minimum amounts per person and per accident."  *Wise*, 818 So.2d at 526-27.  Allowing an insurance company to disclaim coverage to (third-party) accident victims because the driver has engaged in criminal acts "destroy[s] the effectiveness of the policy as to [a] substantial segment of that public."  *Id*.  Thus, as a matter of public policy, courts refuse to give effect to such exclusions where they deprive accident victims of minimum compensation for injuries.

Colorado has generally rejected the argument that Criminal Acts exclusions are void as against public policy.  In *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1045 (Colo. 2011), the court squarely faced the question of whether "the criminal acts exclusion in an excess-insurance policy is [ ] void for violating public policy."  It concluded that "although Colorado's public policy is concerned with protecting innocent tort victims, it is also concerned with insurers' freedom to contract," and thus, "the criminal-acts exclusion . . . does not violate public policy."[4]  *Id.*

The parties devoted relatively little argument to this issue, and the Court declines to pursue the matter further of its own accord.  Because *Bailey* seems to adequately rebut the Czajkowski's sole argument that the Zurich policy's Criminal Acts exclusion should be deemed void as against public policy, the Court would also grant summary judgment to National on this

---

[4]    *Bailey* leaves open the possibility that a Criminal Acts exclusion could be void as against public policy if it were to be construed so broadly as to encompass "criminally negligent misconduct," thus excluding coverage for "negligent non-intentional conduct [that is] precisely the losses a liability policy buyer expects to insure against."  255 P.3d at 1046.  It noted, however, that the conduct at issue in the case involved "felonious criminal conduct [ ] far above mere criminal negligence."  *Id.*  Thus, it avoided the question of whether the Criminal Acts exclusion rendered coverage illusory in that circumstance.  Here, Mr. Huntley's admitted felonious conduct also clearly rises well above the standard of "mere criminal negligence."

ground as well.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** National's Motion for Summary Judgment **(# 29)**. The Plaintiffs' Writ of Garnishment **(# 1-3)** issued against National is **DISMISSED**. The Clerk of the Court shall close this case.

Dated this 13th day of September, 2017.

BY THE COURT:

*/s/ Marcia S. Krieger*

Marcia S. Krieger
Chief United States District Judge